UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 97-2729 - GOLD

MAGISTRATE JUDGE
JOHNSON

UNITED STATES OF AMERICA, )
            )
        Plaintiff, )
            )
vs.           )
            )
ONE REAL PROPERTY LOCATED )   COMPLAINT FOR
AT 2411 NE 32ND COURT, LIGHT- )   FORFEITURE IN REM
HOUSE POINT, FLORIDA, TOGETHER )
WITH ALL APPURTENANCES AND )
IMPROVEMENTS THERETO AND THEREON, )
            )
ONE (1) 1963 CHRIS CRAFT ROAMER YACHT )
KNOWN AS THE MITZ, VESSEL NUMBER )
961848 AND HULL NUMBER 44106 AND )
ALL EQUIPMENT, APPAREL, ENGINES, )
RIGGING, AND OTHER CONTENTS ABOARD, )
            )
        Defendants. )
_____)

The plaintiff, the United States of America, in a civil cause of forfeiture, states:

1. This is a civil forfeiture action <u>in rem</u> over which this Court has subject matter jurisdiction pursuant to Title 28, United States Code, Sections 1331 and 1355.

2. Venue is proper in this district pursuant to Title 28, United States Code, Section 2465, because the defendant property is located in Broward County, in the Southern District of Florida, and will so remain during the pendency of this action.

3. The defendant real property, together with all appurtenances thereto and all improvements thereon, is more particularly known and described as:

   Lot 20, in Block 7, of LIGHTHOUSE POINT 6TH



        SECTION, according to the plat thereof, recorded in Plat Book 42, at Page 35, of the Public Records of Broward County, Florida.

4. The defendant personal property, together with all gear, tackle, rigging, engines, and improvements thereto, is described as a 1963 Chris Craft Roamer Yacht, bearing the name "MITZ," vessel number 961848 and hull number 44106.

5. The United States of America seeks the forfeiture of the defendant real property and vessel pursuant to Title 18, United States Code, Section 981(a)(1)(A), for their involvement in a transaction or attempted transaction in violation of Title 18 United States Code, Section 1957(a), or for being property traceable thereto.

## STATEMENT OF PROBABLE CAUSE

6. In the course of an investigation by the United States Federal Bureau of Investigation, ("FBI"), federal agents uncovered an advance fee scheme operated by Richard Adam.

7. An "Advance Fee Scheme" typically involves a person purporting to be a loan broker, who claims to represent a large unidentified trust or some other source of funds that has the ability to finance loans. Normally in such schemes the loan broker will represent to a targeted victim that the broker can obtain financing from an unidentified source on the behalf of the victim. In addition to the usual "due diligence fee" or "processing fee," the broker will require the victim to pay a large sum in advance, ostensibly to cover the costs of conducting some complex creative financing process. However, as no source of funding actually exists, and the broker merely converts the "Advance Fee" to per-

sonal use or uses the money to promote, finance, continue, and expand the scheme. Eventually the broker tells the victim that the loan application was rejected, usually citing some act on the part of the victim as the reason (i.e., failure to pay additional money, violation of a "secrecy" or "non-disclosure agreement," etc.).

8. Beginning at least as early as 1987, RICHARD ARMAND ADAM, a/k/a Richard A. Adam, a/k/a Rick Adam, was living in the Southern District of Florida and holding himself out to businessmen seeking venture capital as a person who had the experience, training, expertise, contacts, and knowledge necessary to arrange multi-million dollar loans from an unidentified secret trust located in Europe. Although Adam's representations varied slightly with time, and according to from whom he was trying to obtain money, typically Adam stated that he was the grandson of the head of a large secret trust located in Europe that was in a position to fund large scale loans and that he (Adam) was being groomed to take over control of the trust.

9. Adam would tell prospective borrowers that the trust had large sums of money that had been on deposit for decades which the trust needed or wanted (for various reasons) to loan. Adam would tell prospective borrowers that he represented the trust in the United States and had the authority to approve and/or submit loans to the trust. On numerous occasions, Adam represented to and to several prospective borrowers, associates, and employees, that Adam had in fact actually funded such large scale loans, and had been doing so for many years.

10. Adam mailed brochures, solicitations, and advertisements to induce new victims to pay Advance Fees to him and his companies. Numerous victims received letters from Adam (or his associates) which induced them to pay money to Adam and his associates. Specifically, virtually all victims received a loan approval "commitment letter" which stated that their loan had been approved and which directed them to pay additional money in order to proceed with the transaction. Adam also contacted victims who lived in various foreign countries, who wire-transferred Advance Fees to accounts controlled by Adam in Europe.

11. Adam told victims that before he would initiate the funding process, the prospective borrower had to pay an initial fee, ranging from $2,500 to $25,000, to cover the expenses of arranging a loan. After the initial fee was paid, Adam would send a "commitment letter" to the victims, advising them that their loan request had been approved and requesting additional fees be paid to cover the cost of establishing foreign bank accounts and holding companies on behalf of the borrower. The total amount of money paid by the prospective borrower varied from $2,500 to $350,000 per transaction. To date, more than 50 companies and/or individuals, between 1987 and 1995, paid Adam and/or his associates in excess of $5,800,000 in Advance Fees to obtain a loan. However, despite repeated assurances, Adam has not funded a single loan.

12. Between 1987 and 1992, while living in a condominium located on Miami Beach, Dade County, Florida and operating from his residence under the name R.A.A. International, Adam, in concert

4

with others not here named, took Advance Fees of over $700,000 from over a dozen victims.

13. During the Fall of 1992, Adam opened an office in Ft. Lauderdale, Florida under the name IBSA of Florida. Virtually all the victims in this investigation were required to travel from their home states or countries to Ft. Lauderdale, Florida, to sign the loan contracts, and on some occasions, to pay the advance fees.

14. From September 1992 until September 1993, IBSA contracted with at least 15 borrowers who paid a total of in excess of $3,400,000 in Advance Fees. The victims completed all the requirements established by Adam to obtain funding and received representations, via both the U.S. Mail and interstate telephone, that if they paid additional Advance Fees they would receive a loan. A portion of the Advance Fees were sent to Adam in Florida and deposited into his personal bank account at NationsBank of Florida, and part were wire transferred to an account in Luxembourg controlled by Adam. Despite numerous telephonic and written promises from Adam, none have received any funding.

15. In January 1993, Adam opened an IBSA office in Tampa, Florida and between May 1993 and December 1993, the Tampa office of IBSA took in excess of $970,000 in Advance Fees from at least 15 companies which were promised a total of $136,800,000 in loans. All of the victims received "commitment letters" through the mail, and some by interstate facsimile, advising them that their loans had been approved, which induced them to pay the Advance Fee. However, despite numerous telephonic and written promises from Adam

5

and/or his associates, none have received any funding.

16. Many victims were falsely lead to believe that Adam had provided such loans in the past and had been doing so for many years. When the victims asked for references, Adam and his associates failed to inform the victims there were no references as no loans had ever been funded. Rather, Adam and his associates told the victims that the secrecy provisions of the agreements prohibited disclosure of anyone who had received a loan.

17. Finally, the victims were all told that the Advance Fees would be used for expenses in connection with providing the loan; when in truth, virtually all of the money (which can be accounted for) was converted to personal use or utilized to promote and/or expand this scheme. This fact is demonstrated in the following paragraph by tracing an Advance Fee of $225,000 one victim paid Adam on or about November 3, 1992.

### ADAM'S NATIONSBANK ACCOUNT

18. The two $125,000 checks Adam's received from the victim on or about November 3, 1992, were deposited on or about November 9, 1992, into Adam's personal checking account at NationsBank in Lighthouse Point, Florida. On November 6, 1992, Adam had an effective balance (based upon previously issued checks including those which had not yet cleared) of $4,473.93 (which was also traced to the funds of a previous victim); therefore, after the deposit of the two checks, Adam's balance at the NationsBank personal checking account was $229,473.93, from which he made the follow expenditures:

a.  Beginning on or about November 9, 1992, up until April 1993, Adam issued a series of checks to IBSA of Florida, totaling approximately $56,000, for the purpose of continuing and promoting his Advance Fee scheme. These funds were deposited in the NationsBank account of IBSA of Florida. Adam and another conspirator were the only signors on this NationsBank IBSA account.

b.  Between November 1992 and January 1993, Adam wrote a series of checks totaling $8,000 for the repair of the defendant 1963 Chris Craft Roamer yacht named Mitz. In addition, Adam continued to utilize other victims' money, a total of over $60,000, to finance the repair of the defendant vessel. Adam paid for these repairs by writing a series of checks to his wife totaling $27,500, which were deposited into the joint personal account of Adam and his wife at First Union Bank in Lighthouse Point, Florida.

19.  In another transaction involving two other victims, Adams received two checks in October 1992 totaling $225,000. One check was deposited to Adam's personal NationsBank account (previously described) and the other was deposited to the joint personal account of Adam and his wife at First Union Bank. Immediately prior to this deposit of the two checks, this joint personal account had a balance of $2,235.46. By October 28, 1992, after a series of debits by Adam's wife, all of which appear to be of a personal nature, the account balance was approximately $110,000.00. On or about October 29, 1992, Adam's wife wrote a check for $100,800, drawn on the joint personal account of Adam and his wife at First Union Bank, and made payable to the trust account of

7

Adam's attorney. The memo portion of the check stated, "Purchase of Home."

## PURCHASE OF ADAM'S RESIDENCE

20. In October 1991, Adam began renting the defendant property located at 2411 NE 32nd Court, Lighthouse Point, Florida. Sometime during 1992, Adam decided to purchase the home but could not obtain financing. Therefore, the property owner agreed to allow Adam to purchase the house on a "land contract," whereby Adam would make a down payment of $100,000 and pay the balance in two years, or make a large balloon payment. In addition, Adam would pay the owner a monthly payment equal to the owner's mortgage payment until the balance was paid.

21. On or about October 29, 1992, Adam's attorney issued a $100,800 check from his trust account on behalf of Adam to the owner of the defendant property for the down payment. In addition to this money, which is directly traceable to the $112,500 paid by the two victims in October 1992, Adam's attorney subsequently withdrew from his trust account at least a dozen monthly payments of nearly $4,000 each month to the owner of the defendant property. Virtually all the house (mortgage) payments made by Adam's attorney to the owner in 1993 (over $40,000) are traceable to victims who paid Adam (or his associates) an Advance Fee on the promise that the money would be utilized for expenses, holding companies, or bank accounts in connection with obtaining a loan.

22. In the Fall of 1994, Adam made a balloon payment of at least $25,000 to the owner of the residence in order to extend the

8

## VERIFICATION

I, Allen L. Stidger, Special Agent for the Federal Bureau of Investigation, declare under penalty of perjury as provided by Title 28 United States Code, Section 1746, that the foregoing Complaint for Forfeiture on Rem is based upon information known to me, and the facts alleged therein are true and correct to the best of my knowledge.

ALLEN L. STIDGER
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

period he had to pay off the sale price. Loan documents for the refinancing of the house reflect the Adams' utilized proceeds from the sale of the above mentioned 38' Wellcraft boat to make the balloon payment. That boat was purchased with money obtained from one of Adam's victims.

23. By reason of the foregoing, and pursuant to Title 18, United States Code, Sections 981(a)(1)(A), the defendant real and personal properties have become and are forfeit to the United States of America.

WHEREFORE, the plaintiff, the United States of America, requests the Court to declare the defendant properties condemned and forfeit to the United States of America, pursuant to Title 18 United States Code, Sections 981(a)(1)(A), and further requests the Court to direct any and all persons having any claim to the defendant real and personal properties to file and serve their verified claims and answers as required by the Supplemental Rules for Certain Admiralty and Maritime Claims or suffer default thereof, together with such other or further relief as may be just.

Respectfully submitted,

WILLIAM A. KEEFER
UNITED STATES ATTORNEY

BY: _____
SCOTT E. RAY
ASSISTANT U.S. ATTORNEY
99 N.E. Fourth Street
Miami, Florida 33132
Tel.: (305) 536-5495
Fax: (305) 536-7599
Fla. Bar No. 0802050

9

# CIVIL COVER SHEET    97 2729

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I (a) PLAINTIFFS**

UNITED STATES OF AMERICA

**DEFENDANTS**  CIV-GOLD

One real property at 2411 NE 28nd Ct., Lighthouse Point, FL with all appurtenances & improvements and — JOHNSON
One (1) 1963 Chris Craft Roamer Yacht known as the Mitz, vessel #961848 and Hull # 44106 and all equipment, apparel

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Dade
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

BDADE 97cv/2729/ASG/LRJ

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Scott E. Ray, AUSA
99 N.E. 4th Street
Miami, FL    (305)536-5495

ATTORNEYS (IF KNOWN)

**(d)** CIRCLE COUNTY WHERE ACTION AROSE: (DADE) MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

**II. BASIS OF JURISDICTION** (PLACE AN × IN ONE BOX ONLY)

X 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN × IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

18USC 981(a)(1)(A) for involvement in a transaction or attempted transaction in violation of Section 1957(a).

IVa.  2  days estimated (for both sides) to try entire case.

**V. NATURE OF SUIT** (PLACE AN × IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | B FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury— Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | A **PROPERTY RIGHTS** | B☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | X☐ 690 Other | ☐ 840 Trademark | ☐ 810 Selective Service |
| B ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | B ☐ 371 Truth in Lending | A **LABOR** | B **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | B☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| A **REAL PROPERTY** | A **CIVIL RIGHTS** | B **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| B ☐ 220 Foreclosure | ☐ 442 Employment | *Habeas Corpus* | ☐ 790 Other Labor Litigation | A **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | * ☐ 530 General | B☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | * ☐ 540 Mandamus & Other | | | * ☐ 890 Other Statutory Actions *A or B |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | *A or B | | | |

**VI. ORIGIN** (PLACE AN × IN ONE BOX ONLY)

X 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Refiled
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**  CHECK IF THIS IS A **CLASS ACTION**  ☐ UNDER F.R.C.P. 23     **DEMAND $**     Check YES only if demanded in complaint:  **JURY DEMAND:**  ☐ YES  ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See instructions):  JUDGE _____  DOCKET NUMBER _____

DATE  8/22/97

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY: Receipt No._____  Amount:_____
Date Paid:_____  N/ifp:_____

UNITED STATES DISTRICT COURT
S/F I-2
REV. 6/90