*97-2729.sj*
*TS/SR:ie*

FILED BY _____ P J _____ D.C.

99 APR 24 AM 10: 37

C

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:    97-2729-CIV-GOLD |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE JOHNSON |
| | ) | |
| vs. | ) | |
| | ) | |
| ONE REAL PROPERTY LOCATED | ) | **UNITED STATES' MOTION** |
| AT 2411 NE 32ND COURT, | ) | **FOR SUMMARY JUDGMENT** |
| LIGHTHOUSE POINT, FLORIDA, | ) | |
| TOGETHER WITH ALL | ) | |
| APPURTENANCES AND | ) | |
| IMPROVEMENTS THERETO AND | ) | |
| THEREON, | ) | |
| | ) | |
| Defendant. | ) | |

## I.    INTRODUCTION

This case is appropriate for summary judgment in favor of the government.  The government

seeks forfeiture of the captioned real property ("defendant property") as property involved in a

transaction or attempted transaction in violation of Title 18 United States Code, Section 1957(a), or

for being property traceable thereto.  The government alleges that the defendant property is subject

to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A).

**NON-COMPLIANCE OF S.D. fla. L.R.** 7.1.A ((.

A verified complaint was filed on or about August 22, 1997.  Richard Adam was served with notice on or about November 4, 1997.  A claim was filed by Adam's son, Nevin Shapiro, on November 13, 1997, and it is the only claim filed in this case.  On November 24, 1997, Shapiro filed his answer.

## II.   STATEMENT OF FACTS

The material facts of this case are essentially undisputed.[1]  In the course of an investigation by the United States Federal Bureau of Investigation, ("FBI"), federal agents uncovered an advance fee scheme operated by Richard Adam, Shapiro's father.  Adams used the ill-gotten gains from his advance fee scheme to purchase the defendant property.

Beginning at least as early as 1987, Adam began telling persons in need of loans that he had access to millions of dollars in a unidentified secret trust located in Europe.  Virtually all of Adams' victims received a loan approval "commitment letter" which stated that their loan had been approved and which directed them to pay additional money in order to proceed with the transaction.  The victims typically paid an up front borrowing fee, ranging from $2,500 to $25,000, to cover the expenses of arranging the loan.  After the initial fee was paid, Adam would extract additional sums from the victims as processing or banking fees.  The total amount of money paid by the prospective borrower varied from $2,500 to $350,000 per transaction.  To date, more than 50 companies and/or individuals, between 1987 and 1995, paid Adam and/or his associates in excess of $5,800,000 in Advance Fees to obtain a loan.  However, Adam never funded a single loan.

---

[1]  In his answer to the complaint, Shapiro stated that he was "without knowledge or information sufficient to form a belief as to the truth of the allegations" as his response to all substantive allegations contained in the probable cause statement.

a. Purchase of the defendant property

In October 1992, Adam deposited two checks totaling $225,000 received from two of his victims into Adam's account at NationsBank in Lighthouse Point, Florida, and into the joint personal account of Adam and his wife, Ronnie Adam, at First Union Bank. Immediately prior to this deposit of the two checks, this joint personal account had a balance of $2,235.46. By October 28, 1992, after a series of debits by Adam's wife, all of which appear to be of a personal nature, the account balance was approximately $110,000.00. On or about October 29, 1992, Adam's wife wrote a check for $100,800, made payable to the trust account of Adam's attorney. The memo portion of the check stated, "Purchase of Home."

Adam had began renting the defendant property in October 1991. Sometime during 1992, Adam decided to purchase the home but could not or did not want to obtain commercial financing. Therefore, the property owner, James Bistline, agreed to allow Adam to purchase the house on a "land contract," whereby Adam would make a down payment of $100,000 and pay the balance in two years, or make a large balloon payment. In addition, Adam would pay the owner a monthly payment equal to the owner's mortgage payment until the balance was paid.

On or about October 29, 1992, Adam's attorney issued a $100,800 check from his trust account on behalf of Adam to the property owner, Bistline, for the down payment. In addition to this money, which is directly traceable to the money paid by the two victims in October 1992, Adam's attorney subsequently withdrew from his trust account at least a dozen monthly payments of nearly $4,000 each month, payable to Bistline. Virtually all the house (mortgage) payments made by Adam's attorney to Bistline in 1993 (over $40,000) are traceable to victims who paid Adam advance fees. In the Fall of 1994, Adam made a balloon payment of at least $25,000 to Bistline in

3

order to extend the period he had to pay off the sales price.

   b. Filing of the Government's Lis

   Pendens and Subsequent Transfers

The government filed its complaint against the defendant property on August 22, 1997. The warrant of arrest was issued on September 23, 1997. The government's notice of lis pendens was filed on October 2, 1997, and recorded on October 7, 1997.

On October 15, 1997, the property owner, James Bistline, sold the property to Adam's wife, Ronnie Adam, and her son, Nevin Shapiro. On the same day, Ronnie Adam executed a non-identity affidavit and a quit claim deed transferring whatever interest she possessed in the property to Nevin Shapiro. Also on that day, Nevin Shapiro obtained a $290,000 mortgage against the property from Bay Loan Brokers. The mortgage carries an adjustable rate of 12.5 percent interest. Bistline's mortgage of $142,500 was satisfied on that same day.

## III.   MEMORANDUM OF LAW

Summary judgment is appropriate where there is no genuine issue as to any material fact, and that the government is entitled to judgment as a matter of law. Bingham, Ltd. v. United States, 724 F.2d 921, 924 (11th Cir. 1984); Clemons v. Dougherty County, Ga., 684 F.2d 1365, 1368-69 (11th Cir. 1982). "The government "need not negate ... [Shapiro's] ... claim, but need only point to an absence of evidence to support ... [Shapiro's] ... claim." Wolf v. Prudential Ins. Co. Of America, 50 F.3d 793, 796 (10th Cir. 1995), *citing* Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

4

To avoid summary judgment in favor of the government, Shapiro may not rest upon his pleadings; he "must set forth specific facts showing a genuine issue for trial as to those dispositive matters for which ... [he] ... carries the burden of proof." Wolf, 50 F.3d at 796 (citations omitted). There are no genuine issues of material fact in this case. Nor has Shapiro set forth any specific facts that show a genuine issue on dispositive matters that would require a trial in this case. "An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant." Id.

This forfeiture action is subject to disposition by summary judgment in favor of the government. Each issue in this case can be resolved by identifying whether the government or Shapiro has the burden of proof on a particular issue, and then determining whether that burden has been met. The government and Shapiro each share separate burdens of proof in this case. 19 U.S.C. § 1615.[2] The government "bears the initial burden to show probable cause for the institution of the forfeiture action." United States v. $149,442.43 in U.S. Currency, 965 F.2d 868, 876 (10th Cir. 1992) (citations omitted); United States v. One 1944 Steel Hull Freighter, 697 F.2d 1030 (11th Cir. 1983); United States v. $4,255,000 in U.S. Currency, 762 F.2d 895, 905 (11th Cir. 1985).

Once the government establishes probable cause, Shapiro "bears the burden of proving that the requested forfeiture does not fall within the four corners of the statute." U.S. v. $149,442.43, 965 F.2d at 876 (citations omitted). If Shapiro makes no rebuttal, "a showing of probable cause alone will support a judgment of forfeiture." Id. (citations omitted). The issue of probable cause is a

---

[2] The relevant language in 19 U.S.C. § 1615 provides:

> In all suits or actions ... brought for ... forfeiture under the provisions of any law ... where the property is claimed by any person the burden of proof shall lie upon such claimant ... provided, that probable cause shall be

first shown for the institution of such suit or action, to be judged of by the court subject ... .

question of law for the court to decide.  Id.

If the court finds probable cause to believe that the defendant property is subject to forfeiture, Shapiro must establish by a preponderance of the evidence that it is not subject to forfeiture.  United States v. One 1974 Porsche 911-6, 682 F.2d 283, 285 (1st Cir. 1982).  Any defense raised by Shapiro must be proven by a preponderance of the evidence.

A.    **Shapiro's defenses lack merit**.

In his answer, Shapiro raised only two defenses to the allegations contained in the complaint: 1) that the government is equitably estopped from bringing this action for failing to file the complaint in a timely fashion; and, 2) Shapiro is an "innocent owner" of the defendant property "within the meaning of Title 18, U.S.C. § 981(a)(2) because the acts and omissions the government is relying upon in seeking forfeiture were committed without his knowledge."

Shapiro's first defense has no bearing on the probable cause established in the complaint. Moreover, it is without merit, as the government brought this action well within the five-year limitations period contained within 19 U.S.C. § 1621.  Further, the legal standard for determining whether the federal government may be equitably estopped from taking a particular action leaves little opening for Shapiro to establish equitable estoppel.  Equitable estoppel cannot be asserted against the United States regarding actions it takes in its sovereign capacity.  Deltona Corp. v. Alexander, 682 F.2d 888, 891-92 (11th Cir. 1982).

Shapiro's second defense,  which is addressed more fully below, also essentially concedes the probable cause set forth in the complaint.  Nothing in Shapiro's claim or answer suggests that he contests a finding of probable cause to believe that the defendant property constitutes property involved in a transaction or attempted transaction in violation of Title 18 United States Code,

6

Section 1957(a), or for being property traceable thereto.

Accordingly, the property is forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(A), and summary judgment is appropriate pursuant to Fed.R.Civ.P. 56 on the issue of probable cause.

Also appropriate for summary judgment is the issue of whether Shapiro can show, by a preponderance of the evidence, that the defendant property is not subject to forfeiture.     As  the moving party in its motion for summary judgment, the government is required to demonstrate the claimant's lack of a defense to the forfeiture action by bringing to the court's attention references in the record which support its position that the claimant is not an innocent owner.  It is not required to present affirmative evidence to support the motion on that issue.  United States v. Four Parcels of Real Estate, 941 F.2d 1428, 1439 (11th Cir. 1991).  Instead, the non-moving party, in response, must present "significant, probative evidence demonstrating the existence of a triable issue of fact." Chanel, Inc. v. Italian Activewear, Inc., 931 F.2d 1472, 1477 (11th Cir. 1991).  The evidence presented by Shapiro must be "sufficient to show that a reasonable jury could find, by a preponderance of the evidence, that the claimant is entitled to the property." Four Parcels of Real Property, 941 F.2d at 1439.  This Shapiro cannot do.

**B.     Probable Cause Exists to Establish that
the Defendant Property is Subject to
Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(A)**

Probable cause in a forfeiture action is the same standard applied to test the reasonableness of searches and seizures generally.  $149,442.23 in U.S. Currency, 965 F.2d at 876; *see also* United States v. Lot 9, Block 2 of Donnybrook Place, 919 F.2d 994, 998 (5th Cir. 1990).  The government "must demonstrate a reasonable ground for belief of guilt supported by less than prima facie proof,

7

but more than mere suspicion." $149,442.23, 965 F.2d at 876. Indeed, "[t]he determination of probable cause in a forfeiture proceeding simply involves the question of whether the information relied on by the government is adequate and sufficiently reliable to warrant the belief by a reasonable person that ..." the property is subject to forfeiture. United States v. One 56-Foot Motor Yacht Named Tahuna, 702 F.2d ............at 1282. Hearsay is deemed reliable in establishing probable cause if there is a "substantial basis for crediting the hearsay." United States v. All Assets and Equipment of West Side Bldg., 58 F.3d 1181, 1199 (7th Cir. 1995).

The uncontroverted facts in this case show that Shapiro's father, Richard Adam, used fraud proceeds to pay more than $150,000 toward the purchase of the defendant property. The government is required to establish by probable cause a sufficient nexus between the purchase of the defendant property and Adam's illegal money-laundering transactions. $149,442.43, 965 F.2d at 878. The facts set forth in this brief and in the attached affidavit of Special Agent Allen L. Stidger sufficiently establish such a nexus. See affidavit attached as plaintiff's Exhibit One.

Adam concealed his fraud money by purchasing the defendant property with criminal proceeds and then attempting to quit claim the property through his wife, Ronnie Adams, and then to their son, Nevin Shapiro, to further conceal his criminal proceeds and create a straw ownership situation.

C.    **Shapiro is Not An Innocent Owner**

Until the Supreme Court handed down its decision in United States v. 92 Buena Vista Ave., 113 S.Ct. 1126 (1993), persons who purchased forfeitable property after the commission of the underlying offense were found to lack standing to contest a forfeiture action, because of the relation-back doctrine. See United States v. 3181 S.W. 138th Place, 778 F.Supp. 1570, 1572 (S.D. Fla.

8

1991). Under that doctrine, codified in the forfeiture statute, ownership never vested in the post-illegal act transferee because title to the property had vested in the government at the time the illegal acts were committed. 21 U.S.C. § 881(h). In Buena Vista, the Supreme Court held that title did not vest in the government until it received a judgment of forfeiture, with the title then relating back to the time of the commission of the offense. Buena Vista, 113 S.Ct. at 1136.

Accordingly, under Buena Vista, post-illegal act transferees, such as Shapiro, have standing to file a claim and assert an innocent ownership defense. To prevail on that statutory defense as a post-illegal act transferee, however, Shapiro must establish that he lacked knowledge of the illegal acts giving rise to the forfeiture action at the time of the transfer. United States v. Real Estate at 6640 S.W. 48th Street, Miami, Florida, 41 F.3d 1448, 1452 (11th Cir. 1995).

Shapiro's familial relationship to Richard Adam, who is indicted for the fraudulent scheme that generated the proceeds used to purchase the property, certainly casts doubt upon his innocent ownership claim. However, the Court need not make a credibility choice on that issue. Shapiro had constructive notice of the underlying acts because of the lis pendens filed by the government prior to his purchase of the property. See a copy of the lis pendens attached as plaintiff's Exhibit Two.

After filing its complaint and obtaining a warrant of arrest for the property, the government filed a notice of lis pendens in the Broward County land title records. The proper method of giving notice to potential buyers of forfeitable property is to file a lis pendens with the appropriate state or county agency. A notice of lis pendens is filed on the public records and operates as constructive notice to all persons that the title to the property is in litigation and that any interest acquired in the property is subject to the decision of the court. See 28 U.S.C. § 1964 (1994); Fla.Stat.Ann. § 48.23 (West 1994).

9

In Behrens v. Skelly, 173 F.2d 715 (3d Cir.), cert. denied, 338 U.S. 821 (1949), the Court of Appeals for the Third Circuit, applying the general rule of privity, found that:

> Under the rule of privity one who purchases property after a suit [had] been begun against the vendor with respect to the property purchased is 'chargeable with legal or constructive notice so as to render his purchase subject to the event of that suit' even though he may have no actual knowledge of the suit. The theory is that when a controversy regarding property has been submitted for determination by judicial proceedings those who deal with the property thereafter ought to take subject to whatever that determination may be. The property owner whose rights have been put into litigation may not deny his opponent the fruits of victory by transferring the property to another pendente lite.

Id. at 718-19 (citations omitted).

To prevail on a defense of innocent ownership, Shapiro must prove that he was unaware of the activity upon which the forfeiture is sought. 6640 S.W. 48th Street, 41 F.3d at 1452; United States v. One Single Family Residence Located at 15603 85th Avenue North, Lake Park, Palm Beach County, Florida, 993 F.2d 976, 982 (11th Cir. 1991); United States v. One 1980 Bertram 58' Motor Yacht, 876 F.2d 884, 888-89 (11th Cir. 1989). Shapiro would contend that the record does not demonstrate his knowledge of the purchase of the property by Richard Adam with fraud proceeds, or the subsequent laundering of fraud proceeds through the property. This "argument ignores the statutory requirement that the claimant, and not the government, bears the burden of proof on the 'innocent owner' defense. Under [18 U.S.C. § 981(a)(1)(A)], the government need not prove, and the district court need not find, that the claimant had actual knowledge. Rather, it is the claimant's responsibility to prove the absence of actual knowledge." United States v. Four Million, Two Hundred and Fifty-Five Thousand Dollars, 762 F.2d 895, 906-07 (11th Cir. 1985).

The notice of lis pendens informed prospective purchasers, including Shapiro, that they should look to the litigation to determine when and if it was safe to purchase the property involved in this lawsuit.  Shapiro's failure to do so is fatal to his claim of innocent ownership.

## CONCLUSION

The affidavit filed in support of the government's motion for summary judgment establish probable cause to believe that the defendant property is traceable to Richard Adam's fraud proceeds. Nevin Shapiro cannot claim ignorance of Adam's crimes because of the lis pendens filed by the government before his purchase of the property.  For the reasons set forth in this motion, the affidavit, exhibits, and the Verified Complaint *In Rem*, the government respectfully requests that this court enter an order in its favor pursuant to Fed.R.Civ.P. 56 ruling that the government has established probable cause to believe that the defendant property is proceeds traceable to Adam's fraud; that the government's motion for summary judgment be granted; and that the defendant property is deemed forfeited to the government pursuant to 18 U.S.C. § 981(a)(1)(A).

Respectfully submitted,

THOMAS E. SCOTT
UNITED STATES ATTORNEY

BY: _____
WILLIAM H. BECKERLEG, JR.
ASSISTANT U.S. ATTORNEY
500 E. Broward Blvd.
Suite 700
Ft. Lauderdale, Fl 33394
Tel:  (954) 356-7314
Fax:  (954) 356-7180
Fla. Bar No. A5500074

11

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was faxed and mailed this

23rd day of April, 1998, to the following:

Joel Kaplan, Esq.
Counsel for Claimant Nevin Shapiro
100 N. Biscayne Blvd.
Suite 1100
Miami, Florida 33132

Steven R. Brenners, Esq.
2855 University Drive
Suite 110
Coral Springs, Fl 33065-4100

WILLIAM H. BECKERLEG, JR.
ASSISTANT U.S. ATTORNEY

## A F F I D A V I T

I, ALLEN L. STIDGER, having first been duly sworn, do hereby state and depose as follows:

1. I have been a Special Agent of the Federal Bureau of Investigation (FBI) for approximately thirteen and half years and during that time I have participated in and conducted numerous investigations. In addition to my regular training as an FBI agent, I have received specialized training in the conduct of economics crimes and money laundering. For five years (1992 to 1997) I was assigned to the Fraud Squad of the Miami Office of the FBI investigating economic crimes. In that capacity, for three and a half years (March of 1994 until September of 1997) I conducted an investigation of RICHARD ADAM who was suspected of operating an "Advance Fee Scheme."

### ADVANCE FEE SCHEMES

2. This investigation involves an "Advance Fee Scheme," which typically involves a person who purports to be a loan broker that represents a large unidentified source of funds and claims that he can obtain financing on the behalf of a victim. The broker will require the victim to pay a large sum in advance, ostensibly to cover the costs of conducting some complex creative financing process. However, as no source of funding actually exists, the broker merely converts the "Advance Fee" to personal use or uses the money to finance the continuation and expansion of the scheme.

### CRIMES ALLEGED

3. My investigation has included interviews of over fifty witnesses, victims, former employees of IBSA, as well as a review of financial voluminous documentary evidence seized during a search of the Richard Adam's IBSA office. As a result of the investigation described herein, I allege that the following facts and circumstances establish probable cause that RICHARD ARMAND ADAM, also known as RICK ADAM, hereafter referred to as ADAM, has committed the following offenses (among others) in violation of Title 18, United States Code: (a) Wire Fraud, Section 1343; (b) Mail Fraud, Section 1341; and © Money Laundering, Sections 1956 and 1957. Affiant further alleges that the property located at 2411 NE 32nd Court, Pompano Beach, Florida, is forfeitable to the United States under Title 18 U.S.C., Section 981(a)(1).

### BACKGROUND ON RICHARD ADAM



4. As a result of this investigation Affiant has learned that, at least as early as 1987, Richard Adam was living in the Southern District of Florida and holding himself out to businessmen seeking venture capital as a person who had the experience, training, expertise, contacts, and general wherewithal necessary to arrange multi-million dollar loans from an unidentified secret trust located in Europe. Although Adam's representations varied slightly with time, and according to from whom he was trying to obtain money, typically Adam stated that he was the "grandson" of the head of a trust that was in a position to fund large scale loans. Adam would tell prospective borrowers that he (Adam) represented the trust in the United States and had the authority to approve and/or submit loans to the trust. On numerous occasions and to several prospective borrowers, associates, and employees, Adam represented that he in fact had actually funded such large scale loans in the past, and had been doing so for many years.

## MAIL AND WIRE FRAUD

5. In order to facilitate this scheme, Adam utilized the U.S. Mail and interstate wire communications to induce victims to pay Advance Fees to him and his companies. Numerous victims received letters from Adam (or his associates) through the U.S. Mails which induced them to pay money to Adam and his associates. Specifically, virtually all victims received a "commitment letter" which stated that their loan had been approved and directing them to pay additional money to proceed with the transaction. Adam also used, and/or caused to be used, interstate communication facilities, including both telephone and facsimile, to contact victims who lived in various states and foreign countries. Finally, at the direction of Adam and his associates, many victims used interstate communication facilities to wire transfer Advance Fees to accounts controlled by Adam in Europe.

## THE "ADVANCE FEE"

6. Adam represented to victims that before he would initiate the funding process the prospective borrower had to pay an initial fee (ranging from $2,500 to $25,000) to cover expenses of arranging the loan. After the initial fee was paid, Adam would cause a "commitment letter" to be sent to the victims, advising that their loan request had been approved and requesting addition fees to cover the cost of establishing foreign bank accounts and holding companies on behalf of the borrower. The amount of money paid by the prospective borrower varied from as little as $2,500, to in excess of

2

$350,000 per transaction.  To date, Affiant is aware of well in excess of fifty companies and/or individuals who (between 1987 and 1995) paid Adam and/or his associates advance fees totaling close to five million dollars ($5,000,000) during this period; however, Adam has never funded a single loan of any size.

## INTERNATIONAL BUSINESS SERVICES ALLIANCE

7.  In the Spring of 1992, Richard Adam was introduced to a business woman (hereafter referred to as S-2) in Stamford, Conneticutt who operated a company called International Business Services Alliance (IBSA), which provided relocation assistance to businesses.   Subsequently,  S-2 agreed to allow RICHARD ADAM (who had been operating under the name R.A.A. INTERNATIONAL) to utilize the name IBSA, which was an acronym for S-2's existing company.

## IBSA OF FLORIDA

8.  During the fall of 1992, Adam opened an office in Ft. Lauderdale, Florida under the name IBSA of Florida and placed S-1 in charge of the office which acted as the administrative controlling office for the IBSA offices in Stamford, Conn., and later an IBSA office in Tampa, Florida.

## IBSA of STAMFORD, CONN.

9.  From September of 1992 until September of 1993, S-2 was an officer of IBSA OF FLORIDA and in that capacity contracted with at least fifteen (15) borrowers which paid a total of almost 3.5 million dollars  in advance fees.  All victims received representations, via both the U.S. Mail and interstate telephone, that if they paid the advance fees they would receive a loan. A portion of the Advance Fees were sent  to ADAM in Florida and deposited to his personal bank account at NationsBank of Florida (account # 3506194690), and part were wire transferred to an account in Luxembourg controlled by Adam.   Despite numerous telephonic and written promises from ADAM, none have received any funding.

## VICTIM ONE

10.  On February 18, 1994, Victim-1 (hereafter V-1) appeared at the New York FBI office and provided to following information:

a.  In September of 1992, in hopes of obtaining funding for a European construction project, V-1 met with S-2 of IBSA of Stamford, Connecticut, who stated that

3

she could secure financing for V-1 through ADAM and S-1, principals of IBSA OF FLORIDA, located in Ft. Lauderdale, Florida. Following a number of meetings and communications between V-1 and Adam, S-1, and S-2, it was agreed that IBSA, through the trust in Luxembourg, would fund a thirty-five million dollar ($35,000,000) loan.

b.  On October 7, 1992, V-1 received a letter in the mail from S-2 stating that she (S-2) and the "Trustee" had approved V-1's loan request.  Thereafter, on October 19, 1992, V-1 paid S-2 twenty-five thousand dollars ($25,000) at her office in Stamford and was told that the $25,000 was for expenses to arrange the loan.  (On October 21, 1992, the $25,000 was deposited to ADAM's personal NationsBank account #3506194690.)

c.  After paying the $25,000, V-1 received a letter from S-2 dated October 30, 1992, which stated "...your Loan Request has been formally approved by the Trust Board of Directors."  The letter went on to state, "At this time Mr. Adam would like you to forward to our office a bank draft of $225,000 payable to Richard Adam.  He is presently in Europe setting up your Holding Company."  On November 3, 1992, V-1 gave S-2 two checks made payable to ADAM for one hundred and twenty five thousand dollars ($125,000) each, totaling two hundred and twenty-five thousand dollars ($225,000).   V-1 was given specific assurances that the $225,000 would be utilized by Adam for the sole purpose of establishing a holding company in Europe on behalf of V-1 in order to facilitate the loan.  (On November 9, 1992, the $225,000  was deposited to ADAM's personal NationsBank account #3506194690.)

d.  On November 6, 1992, V-1 received another letter from S-2 which stated that "...your Loan Request has been formally approved by the Board of Directors of the Private Investment Group."  On November 23, 1992,  V-1 received another letter from S-2 which requested an additional  $100,000, which on November 24, 1992, V-1 paid with two separate wire transfers to a bank account in Luxembourg controlled by ADAM.  V-1 was told that these funds would be used to establish a bank account on their behalf to facilitate the transfer of the thirty five million dollars once the loaned was funded.

f.  Subsequently V-1 was told that both a bank account and holding company had been established on their behalf and that they would receive their first installment of one million dollars ($1,000,000) on January 3, 1993.  However, from that date until the present, despite having been given repeated assurances, both telephonically and through

4

the mails, that the funding was forthcoming, V-1 has not received any funds from IBSA or ADAM.

### VICTIM TWO

11. Victim Two (V-2) was two partners who each to provided funding for a company they had been introduced to by S-2. On October 16, 1992, each of the two partners gave S-2 checks for $112,500. Both checks were deposited on October 19, 1992; one to Adam's personal NationsBank account (previously described) and the other to the joint account of Adam and his wife (RONNIE ADAM) at First Union (account #15229529108). On October 16, 1992, prior to this deposit of V-2's money, RICHARD and RONNIE ADAM's First Union account only had a balance of $2,235.46. By October 28, 1992, after a series of debits by Adam's wife, all of which appear to be of a personal nature, the account balance was $110,171.29. On October 29, 1992, Richard Adam's wife wrote a check from the First Union account for $100,800 to the trust fund account for Adam's attorney and the memo portion of the check read "Purchase of Home."

### MISREPRESENTATIONS TO VICTIMS

12. The experience of V-1 and V-2 in dealing with Adam and IBSA is an example how Adam's scheme operated as their experience is fairly typical of that of other victims who dealt with Adam and his associates (with some variations in the explanations given as to the specifics of how the money for the loan would be generated). The key point is V-1 and V-2, as were the other victims in this matter, were lead to believe that Richard Adam and his associates had the knowledge, training, experience, contacts and expertise to arrange a multi-million dollar loan, when in fact, neither Adam, nor any of his associates, ever had any such experience or ability.

13. In addition, V-1 and V-2 (as were many of the victims) were also lead to believe that Adam had provided such loans in the past and had been doing so for many years. When the victims asked for references, instead telling them the truth (that references could not be provided because no one had ever received a loan), Adam and his associates told the victims that the secrecy agreements of the transaction prohibited disclosure of anyone who had received a loan.

14. Finally, the victims were all told that the advance fees would be used for expenses in connection with providing the loan; when in truth, virtually all of the money (which can be accounted for) was converted to personal use or utilized to continue and/or

5

expand this scheme.  This fact is demonstrated in the following paragraph by tracing the $225,000 V-1 paid Adam on November 3, 1992.

## ADAM'S NATIONSBANK ACCOUNT

15.  As a result of examination of financial records, Affiant has learned that the two $125,000 checks S-2 received from V-1 on November 3, 1992 (see paragraph 10c above), were deposited on November 9, 1992, into NationsBank Account number 350619460.  That account was the personal checking account of Richard Adam (he was the only signor) at the NationsBank branch in Lighthouse Point, located on the north side of the intersection of Federal Highway and Sample Road.  On November 6, 1992, Adam only had an effective balance (based upon previously issued checks including those which had not yet cleared) of $4,473.93 (which was also traced to the funds of a previous victim); therefore, after the deposit of V-1's money, Adam's balance was $229,473.93 (all of which was directly traceable to money from victims),  from which he made the following expenditures:

a.  Beginning immediately on November 9, 1992, up until April 5, 1993, Adam issued a series eight (8) of checks to IBSA of Florida, totaling $56,000, for the purpose of continuing the operation of this scheme. These funds were deposited in the NationsBank account of IBSA of Florida (at the same branch as Adam's personal account).  Adam and S-1 were the only signors on this account and S-1 used the money to pay the general operating expenses of the three IBSA offices.  By doing so, the period of this scheme was extended and as a result, numerous other victims were induced to pay additional Advance Fees to Adam and his associates.

b.  On November 10, 1992, Adam wrote a $1,000 check to Ocean Harbor Marine (OHM) in Lighthouse Point, Florida as a deposit on a new 38', 1992 Wellcraft Yacht, hull number WEL-C6615-E192.  On November 19, 1992, Adam returned to OHM and wrote another check for $19,000, leaving a balance of $85,000.  Adam then filled out a loan application to finance the $85,000 balance, but his loan request was denied.  On December 19, 1992, Adam returned to OHM and paid the balance on the yacht in full with $85,000 in  U.S. currency, which was corroborated by an IRS Form 8300 ("CTR").  On this date Adam also wrote another check for $733.92 to OHM for some purchase related to the yacht.

6

c.  On November 13, 1992, Adam wrote a $1,000 check to Coral Cadillac of Pompano Beach, Florida for deposit on a Cadillac Seville.  On November 16, 1992, Adam wrote another check for $10,454.57 to Coral Cadillac for the lease of the Cadillac.

d.  Beginning on November 10, 1992, up until January 8, 1992, Adam wrote a series of checks totaling $8,000 to his brother (Roger Adam) and to his father (Real Adam) for repair of a  1963 Chriscraft Roamer yacht (vessel #961848 and hull #44106) which had previously sank in the canal behind Adam's residence.  In addition to the funds directly traceable to V-1, until December of  1994, Adam continued to utilize other victims' money  (a total of over $60,000) to finance the repair of the Chriscraft yacht named "Mitz."  Adam paid for these repairs by writing a series of checks to his wife totaling $27,500, which were deposited into a joint account at First Union Bank of Lighthouse Point, Florida (the bank is physically located across sample road from the NationsBank from where Adam wrote the checks).

e.  In addition to the above expenditures, the tracing of the $225,000 paid to Adam by V-1 in November of 1992, has revealed that Adam  withdrew $25,000 in cash and spent over $40,000 on what could only be characterized as personal expenses.  One payment of $27,676.10 was a settlement on a credit card account with American Express.

PURCHASE OF ADAM'S RESIDENCE

16.  In October of 1991, Adam began renting a house located 2411 NE 32nd Court, Lighthouse Point, Florida.  The owner of the house (and his attorney) has advised Affiant that in 1992 Adam wanted to purchase the home but could not obtain financing.  Therefore, the owner agreed to allow Adam to purchase the house on a "land contract," whereby Adam would pay a down payment of $100,000 and the balance in two years, or make a large balloon payment.  In addition, Adam would pay the owner a monthly payment equal to the mortgage payment until the balance was paid.

17.  On October 29, 1992, Richard Adam's attorney (Steven Brenners) paid the owner of the residence $100,800 from his trust fund account on the behalf of Adam as a down payment on the residence.  This money is directly traceable to the $112,500 paid by V-2 on October 16, 1992 (see paragraph 11 above).  In addition to this money, Adam's attorney subsequently made at least a dozen monthly payments of almost $4,000 each from the attorney's trust fund account  to the owner of the residence.  Affiant's review of the attorney's trust fund account and Adam's First Union account, has revealed that

7

virtually all the payments in 1993 on Adam's residence (over $40,000) were from money traceable to victims who paid Adam (or his associates) an Advance Fee on the promise that the money would be utilized for expenses, holding companies, or bank accounts in connection with obtaining a loan.

18.  Affiant has learned that in fall of 1994, Adam made a large balloon payment of at least $25,000 to the owner of the residence in order to extend the period he has to pay off the balance of the "land contract."  In documents Adam and his wife supplied to a mortgage company to obtain a loan to refinance the house during August of 1995, Adam's wife stated that they utilized proceeds from the sale of the 38' Wellcraft to make the balloon payment.  That boat was purchased with money obtained from V-1 (see paragraph 15b above).

## ADMISSIONS OF RICHARD ADAM

19.  On April 12, 1994,  while Affiant was executing a search warrant on the IBSA office in Fort Lauderdale, Florida, S-1 advised that Adam was on the telephone from Luxembourg and insisted on speaking with the Affiant.  During the conversation that followed, Adam made the following admissions to Affiant:

a.  That Adam's grandfather (who supposedly headed the secret Trust) was dead.  Adam added that if his grandfather were still alive he would be over one hundred years old.

b.  That since 1987 Adam had taken Advance Fees from over forty people without ever providing anyone a loan.  However, Adam added that he was "still working on it."

c.  That Adam had converted the initial Advance Fees ($25,000 in most cases) he obtained from his clients to personal use.  (Affiant had already reviewed bank records seized a few days earlier during a consent search which made that fact apparent.) Adam contended that the Advance Fees were "his money" and stated that he "had to live."

## CONCLUSION

20.  As a result of the searches, discussions with over fifty persons associated with Adam, and review of several thousand pages of documentary evidence, Affiant has learned that since 1987, Richard Adam, operating under the names IBSA and RAA, has taken over five million dollars in Advance Fees from over fifty (50) different victims.  The Advance Fees were paid to Adam (or his associates) because the victims

8

were lead to believe that Adam had the ability, experience, training, and contacts to arrange sophisticated forms of financing and had done so many times over a period of several years; when in fact, Adam had no such ability and had never funded any loan.  The victims were also assured that the Advance Fees (while partially non-refundable) would be utilized to facilitate the promised loan; however, Adam used the money to expand the scheme or converted it to his personal use; to include the purchase of the following in violation of Title 18, United States Code:

        a.  The residence of Richard Adam, located at 2411 NE 32nd Court, Lighthouse Point, Florida (Sections 1957(a) and 1956(a)(3)).

        b.  One 1992 Wellcraft Yacht, hull number WEL-C6615-E192,  (Sections 1957(a).  This vessel was subsequently sold in 1995 and the proceeds used to make a balloon payment on the above forfeitable residence.

NEVIN SHAPIRO

        21.  When this investigation was initiated in March of 1994, Affiant became aware that NEVIN SHAPIRO was the son of Richard Adam's wife (Ronnie Adam) from a previous marriage and lived in the residence with Richard and Ronnie Adam at 2411 NE 32nd Court, Pompano Beach, Florida.  Early in this investigation (at least by April of 1994) Affiant learned from numerous sources that Richard Adam had not been at his residence since at least January of 1994, and apparently did not intend to return to the United States out of fear of being arrested by the FBI.  In fact, had Adam returned the United States after the execution of the search warrant during April of 1994, I would have arrested him on site, as I felt I had substantial probable cause that he had committed the crimes described above.  After April of 1994, Adam not only knew that his office in Fort Lauderdale had been searched, but that several people had spoken to the FBI about his activities to include victims, employees of IBSA and others.  Therefore, after at least April of 1994, Adam was a "De Facto" fugitive (even though he had not yet been charged), never returning to his home, wife, and family (which included Nevin Shapiro).  During that time, Nevin Shapiro lived with Ronnie Adam in the residence abandoned by Adam.

        22.  On numerous occasions after April of 1994, Affiant went to the residence at 2411 NE 32nd Court, Pompano Beach, Florida and conducted surveillances, spoke with neighbors, and checked vehicle registrations that all confirmed that Nevin Shapiro was residing at that residence, but that Richard Adam was not.  On some occasions, Affiant

9

personally observed Nevin Shapiro depart the residence and on numerous occasions, at various times of the day and night, observed a vehicle that I had previously seen him drive parked at the residence.  On one occasion I spoke with  neighbors who lived next door to the residence who told me that after they had not seen Adam at the house for an extended period of time, they mentioned this fact to Ronnie Adam who responded: "As long as he keeps paying the bills, I don't care if he ever comes back."   During this time I had information from other sources that Richard Adam was living permanently in Luxembourg with another woman and had no intention of ever coming back to the United States for fear of being arrested.  I also had information that Nevin Shapiro and Ronnie Adam were both aware of this, as a private investigator hired by a victim sent Nevin Shapiro a letter in a failed attempt to gain his cooperation against Adam.

23.  On one occasion Affiant went to the door of the residence and was greeted by a young woman named Ms. Davidson who stated that she was Nevin Shapiro's "girlfriend."  Ms. Davidson advised that she was "house sitting" and had been warned that the FBI was investigating Richard Adam and might come to the house.  Affiant specifically advised Ms. Davidson that Richard Adam was under investigation by the FBI and that I wanted to know his whereabouts.  Ms. Davidson  indicated to affiant that she had been cautioned to not tell the FBI anything.  Subsequent to this incident, Nevin Shapiro was observed going to a residence on Miami Beach determined to be occupied by this same Ms. Davidson.

24.  On another occasion Affiant went to the residence and attempted to speak with Ronnie Adam, but she refused to talk to affiant and called Attorney Steven Brenners, the same attorney who was utilized to purchase the residence (see paragraph 17  above).  Affiant spoke on the telephone with Attorney Brenners from this residence, and in the presence of Ronnie Adam, and advised them both in unequivocal terms that Richard Adam was under investigation by the FBI and that I wanted to know his whereabouts.  Attorney Brenners told Affiant that he would want to be present to "hold Ronnie's hand" if she was questioned by the FBI.  Affiant pointedly informed Attorney Brenners that if Ronnie Adam wanted an attorney present when she spoke with the FBI she was entitled to do so; however, it would not be Attorney Brenners, as Affiant believed him to have a "conflict of interest," and Affiant strongly intimated to Brenners that he was

also a subject of the investigation.  This incident occurred while Nevin Shapiro was a living in the residence.

25.  During the summer of 1995, affiant learned that Attorney Steven Brenner had hired a private investigator to find out if there was an outstanding warrant for Richard Adam, becuase Adam wanted to return to the United States to obtain a loan in order to pay off the balance of the "land contract."  It was subsequently learned by Affiant that checks had been made on Adam's criminal history by several sources, one of which was law enforcement officer who had been in contact with the private investigator.  Affiant  then learned that Adam had in fact come to the United States, applied for and was approved for a loan on the residence at 2411 NE 32nd Court, Pompano Beach, and was scheduled for closing within a matter of days.  Affiant contacted the Mortage company who was to make the loan to determine the closing date in order that Adam could be arrested; however, the owner of the Mortage company refused to cooperate with the Affiant and cancelled the loan, thereby frustrating the attempt to arrest Adam.  Affiant learned that the owner of the mortage company was close personal friends with Attorney Brenners and I suspected that Adam had been "tipped off."  Affiant's suspicions were subsequently confirmed by a statement made by Adam during August of 1997.  This occurred during a time when Nevin Shapiro was living at the residence.

26.  In the 1996, Richard Adam was arrested in Luxembourg on a major money laundering case which involved several million dollars of "drug money."  As a result of that case, Richard Adam spent several months in a Luxembourg jail before being released on bail.  This occurred during a time when Nevin Shapiro was living at the residence with Richard Adam's wife, Ronnie Adam.  After being released from a Luxembourg jail, during March of 1997,  Adam was again arrested on money laundering charges, this time in Monaco.

27.  During the April of 1997, a warrant was issued for the arrest of Richard Adam based on a complaint which was supported by an affidavit sworn by Affiant.  During the summer of 1997, Affiant learned that Adam was living in the Windsor, Canada area and Affiant initiated steps to have Canadian law enforcement locate and arrest him.  In August of 1997, Affiant learned that Richard and Ronnie Adam were planning on putting the residence into Nevin Shapiro's name.  It was learned that Ronnie and Richard Adam wanted to make a gift of their interest in the proerty to Nevin Shapiro, so that he could use

11

the equity to obtain a loan sufficiently large enough to pay off the balance of the "land contract" and the original mortage, as well as pay Adam his interest in the property. Affiant contacted a bank security person regarding this matter and learned that all the contacts with the mortage company through which the loan was being obtained had been made by Ronnie Adam, even though Nevin Shapiro's name was on the loan application. Affiant obtained a copy of the loan application which was purportedly signed by Nevin Shapiro and compared the signature to known writings of Ronnie and Nevin Shapiro.  In the Affiant's non-expert opinion, the signature of Nevin Shapiro on the loan application was grossly inconsistent with that of the signature of Shapiro on his known writing.  However, the signature of Ronnie Adam on her known writing, did not appear to be inconsistent, and in fact bore striking similiarities.  This matter was referred to the United States Attorney's office which opened a new investigation as an attempted bank fraud.

28.  On August 22, 1998, Richard Adam was arrested by the Royal Canadian Mounted Police at a residence near Windsor, Canada.  At the time of his arrest Adam was acompanied by a woman described to Affiant as his "girlfriend."  Thereafter, Affiant advised the financial institution that was to make a loan on the property that  Richard Adam had been arrested.  Following Adam's arrest in Canada, seven co-conspirators of Adam were arrested in the United States and there was a public press release issued by the United States Attorney's Office in South Florida and articles in local papers.  In addition, in Canada Richard Adam had an extensive three day detention hearing before a Canadian judge order Adam detained pending the formal extradition hearing.   The news media in Windsor,  Canada gave this matter extensive coverage.

29.  In August  of 1997, Affiant conferred with a United States Attorney regarding the filing of this forfeiture matter and requested that a "Les Pendens" be filed on this property.  Subsequently, FBI forfeiture analyst Chris Mangracina advised Affiant that the Les Pendens had been filled.  During the month of August of 1997,  Affiant had numerous conversations with the owner of this residence as well as the attorney who represented the owner of the property.  Both were advised in unequivocal terms that as soon as Richard Adam was in custody, the FBI would initiate a  forfieture action on this property.  During the last week of August and the first week of September of 1997, Affiant had additional conversations with the owner of the property and his attorney and advised them that a Les Pendens had filed on the property and a forfeiture seizure was imminient.

12

## SUMMARY

30.  It is Affiant's belief that Richard Adam utilized at least $165,000 of the victim's money to obtain his interest in the residence located at 2411 NE 32nd Court which is the subject of this forfeiture.  In an attempt to preserve their interest in the property, it is apparent that Richard and Ronnie Adam have utilized Nevin Shapiro to effect a "straw purchase" of the property.  In light of the facts and circumstances described above, Nevin Shapiro either knew, or should have known, that Richard Adam was under investigation for criminal activities and was being pursued by the FBI.

Further, affiant sayeth not.

ALLEN L. STIDGER, Special Agent
Federal Bureau of Investigation

Sworn and subscribed to me this _26th_ day of February, 1998.

Notary Public

LANA WIDENER
Notary Public
STATE OF TEXAS
My Comm. Exp. 02/26/2000

13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FILED BY _____ D.C.

97 OCT -2 PM 3:30

CLERK U.S. DIST. CT
S.D. OF FLA. - MIAMI

UNITED STATES OF AMERICA,  )   CASE NO. 97-2729-CIV-GOLD
                           )   Magistrate Judge Johnson
            Plaintiff,     )
vs.                        )
                           )
ONE REAL PROPERTY LOCATED  )
AT 2411 NE 32ND COURT, LIGHTHOUSE )
POINT, FLORIDA, TOGETHER WITH ALL )
APPURTENANCES AND IMPROVEMENTS    )
THERETO AND THEREON,       )
                           )
ONE (1) 1963 CHRIS CRAFT ROAMER   )   **NOTICE OF LIS PENDENS**
YACHT KNOWN AS THE MITZ, VESSEL   )
NUMBER 961848 AND HULL NUMBER     )
44106 AND ALL EQUIPMENT, APPAREL  )
ENGINES, RIGGING, AND OTHER       )
CONTENTS ABOARD,           )
                           )
            Defendants.    )
_____)

CK 27097PG0679

        Plaintiff, United States of America, pursuant to F.S. §48.23,

as made applicable hereto by 28 U.S.C. §1964, hereby gives Notice

of the filing on August 22, 1997 in the United States District

Court, in the matter captioned above, of its Complaint for

Forfeiture in Rem, and on September 24, 1997 of the issuance by the

Clerk of Court of a Summons in Rem, concerning the premises located

at 2411 N.E. 32nd Court, Lighthouse Point, Florida, together with

all appurtenances thereto and all improvements thereon, is more

particularly known as:

                Lot 20, in Block 7, of LIGHTHOUSE
                POINT 6TH SECTION, according to the
                plat thereof, recorded in Plat Book
                42, at Page 35, of the Public

DEFERRED ITEM
Return Document To
Business Operations


GOVERNMENT EXHIBIT 2

Records of Broward County, Florida.

The object and intention of this litigation is to have the Court decree that as of September 24, 1997, the defendant premises and property became condemned and forfeit to the United States of America, due to its use in violation of Federal Law, pursuant to 21 U.S.C. §881(a)96).

All persons having an interest in said defendant, by way of title, mortgage, lien or otherwise, wishing to preserve same, must file and serve a claim and answer in this matter as required by Rule C(6), Supplemental Rules for Certain Admiralty and Maritime Claims, 28 U.S.C. app., or suffer forfeiture thereof by default.

Title to the defendant property is presently believed to be held in the name(s) James D. Bistline.

Respectfully submitted,

THOMAS E. SCOTT
UNITED STATES ATTORNEY

By: _____

Scott E. Ray
Assistant U.S. Attorney
99 N.E. 4th Street
Suite 633
Miami, Florida 33132
Fla. Bar No. 0802050
Tel: (305)536-5495
Fax: (305)536-7599

SR:med
sr\craft.nlp

Certified to be a true and correct copy of the original.
Carlos Juenke, Clerk
U.S. District Court
Southern District of Florida

By _____
(Deputy Clerk)

Date __OCT 0 2 1997__

RECORDED IN THE OFFICIAL RECORDS BOOK
OF BROWARD COUNTY, FLORIDA
COUNTY ADMINISTRATOR